**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CLEMENS FRANEK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.: 08-CV-0058 |
| | ) | |
| WALMART STORES, INC., and | ) | Judge Robert M. Dow, Jr. |
| TARGET CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| JAY FRANCO & SONS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO.: 08-CV-1313 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| CLEMENS FRANEK, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Currently pending before the Court is Plaintiff Jay Franco & Sons, Inc.'s ("Jay Franco" or "Plaintiff") motion for partial summary judgment. For the reasons set forth below, Plaintiff's motion for partial summary judgment [41] is granted as to Count II of its Complaint for Declaratory Judgment and Other Relief and granted as to Counts I-IV of Defendant Clemens Franek's ("Defendant" or "Franek") Counterclaims against Franco for trademark infringement, false designation of origin, deceptive trade practices and fraud.

## I.   Background

This litigation commenced when Franek, Defendant for purposes of this motion, filed a three-count complaint [1] against Wal-Mart and Target (08-cv-58[1]).  In that complaint, Franek alleged trademark infringement, false designation of origin, and violation of state law based on sales made by those retailers of a round beach towel on which he owns a federally registered trademark.  Jay Franco purportedly distributed the towels to Wal-Mart and Target and asserts that it is responsible to defend those retailers in this litigation.  Subsequently, Jay Franco filed a separate action against Franek (08-cv-1313).  The later-filed case originally was assigned to another judge in this district, but since has been consolidated [30] before this Court.

In case number 08-cv-1313, Jay Franco filed a five-count complaint[2] against Franek on March 5, 2008.  In its complaint, Jay Franco seeks (i) a declaratory judgment that its past advertisements, sales, purchases, and marketing of the round beach towels do not infringe Defendant's alleged trademark and do not violate the Lanham Act, 15 U.S.C. § 1051 *et seq.* (Compl. ¶¶ 16-21); (ii) a declaratory judgment that the trademark is invalid because it is functional (Compl. ¶¶ 22-26); (iii) cancellation of the trademark as invalid because it was obtained through deception of the United States Patent and Trademark Office ("USPTO") (Compl.¶¶ 27-34); (iv) a declaratory judgment that Franek's trademark rights are invalid because of an invalid assignment (Compl. ¶¶ 35-40); and (v) a declaratory judgment as to non-infringement under Illinois law (Compl. ¶¶ 41-44).  Franek answered the complaint on May 6, 2008, and asserted four counterclaims [34]: (i) trademark infringement (Counter. ¶¶ 15-31); (ii)

---

[1] The summary judgment motion was only filed in the action between Jay Franco (as Plaintiff) and Franek (as Defendant) and therefore the Court will apply those party designations.

[2] Franco's complaint does not appear on the docket under case number 08-cv-58.  It only appears as [1] under its original case number of 08-cv-1313.  All other relevant documents for purposes of the present motion, including Franek's answer and counterclaims to Franco's complaint, are included in 08-cv-58.

false designation of origin (Counter. ¶¶ 32-48); (iii) an Illinois state law claim for violation of the Deceptive Practices Act (Counter. ¶¶ 49-65); and (v) fraud under New York law (Counter. ¶¶ 66-81).

Jay Franco has filed a motion seeking summary judgment on Count II of its complaint and all four counts of Franek's counterclaim.  However, Jay Franco's argument is limited to the alleged functionality of Franek's trademark.  If the Court finds that the trademark is functional and invalid, summary judgment on Count II of Jay Franco's complaint will be granted and that ruling also will dispose of all counts of the counterclaim.  However, if summary judgment is denied as to Count II, it necessarily will be denied as to the counterclaim, because Jay Franco has made no separate argument as to those Counts.

## II.    Facts

### A.    Local summary judgment standards

The Court takes the relevant facts from the parties' respective Local Rule ("L.R.") 56.1 statements.[3]  The Court takes no position on whose version of disputed factual matters is correct. L.R. 56.1 requires that statements of facts contain allegations of material fact, and that the factual allegations be supported by admissible record evidence.  See L.R. 56.1; *Malec v. Sanford,* 191 F.R.D. 581, 583-85 (N.D. Ill. 2000).  The Seventh Circuit teaches that a district court has broad discretion to require strict compliance with L.R. 56.1.  See*, e.g., Koszola v. Bd. of Educ. of the City of Chicago,* 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon,* 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval,* 71 F.3d 1311, 1317 (7th Cir. 1995) (collecting cases)).

---

[3]  See [44] Plaintiff's Local Rule 56.1(a)(3) Statement of Facts ("Pl. SOF"); [48] Defendant's Response to Plaintiffs' Local Rule 56.1 Statement of Facts ("Defs. Resp."); [48] Defendant's 56.1(b)(3)(C) Statement of Additional Facts ("Defs. SOF"); and [50-2] Plaintiff's Response to Defendant's 56.1(b)(3)(C) Statement of Additional Facts ("Pl. Resp.").

Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider that statement. See, *e.g., Malec,* 191 F.R.D. at 583. Additionally, where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems admitted that statement of fact. See L.R. 56.1(a), (b)(3)(B); see also *Malec,* 191 F.R.D. at 584. The requirements for a response under L.R. 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000). In addition, the Court disregards any additional statements of fact contained in a party's response rather than in its statement of additional facts. See, *e.g., Malec,* 191 F.R.D. at 584 (citing *Midwest Imports,* 71 F.3d at 1317).

**B.    Pertinent facts for purposes motion for summary judgment**

Plaintiff Jay Franco is incorporated and has its principal place of business in New York. It is in the business of importing, marketing, distributing, and selling bedding, bath, beach, and kitchen accessories. Pl. SOF ¶ 1. Plaintiff distributes its products to Walmart Stores, Inc. ("Walmart") and Target Corporation ("Target"), among other retailers. *Id.*

Franek conceived the idea of marketing and selling a round beach towel around 1985. Def. SOF ¶ 2. In 1985, Defendant Franek and others founded CLM Design, Inc. ("CLM"), d/b/a Son International, Inc. or Sons, Inc. Pl. SOF ¶ 3.[4] CLM was an Illinois corporation engaged in the business of marketing, selling, and distributing beach accessories, including round beach towels. *Id.* CLM has maintained offices, affiliates or subsidiaries in California and Rhode Island. *Id.* On October 29, 1986 CLM filed a Trademark Application for a "round or circular" configuration of a beach towel (hereinafter the "Round Towel Mark"). *Id.* at ¶ 4. The first use

---

[4] When referring to the corporate entity that originally owned the trademark, the Court will refer solely to CLM.

of the round beach towel was on August 15, 1985.  Def. SOF ¶ 3.  In its Trademark Application,

CLM submitted a depiction of a white disc and stated that that application sought registration for

a mark "used in connection with beach towels, beach towel product configuration, packaging,

promotional materials and labels."  Pl. SOF ¶ 12.  The application for that trademark claimed

that CLM first used the Round Towel Mark in interstate commerce on February 14, 1986.  *Id*. ¶

4.

The USPTO issued a First Office Action refusing registration of the application on the

ground that the requested mark constituted "a configuration of the goods" and as such, was

"merely descriptive of the goods."  Pl. SOF ¶ 14.  The First Office Action stated that "[i]n the

absence of evidence that * * * [the mark] ha[d] a secondary meaning or had become distinctive,

as applied to the goods, it * * * [could] not be registered on the Principal Register."  *Id*.  The

First Office Action further requested a copy of any patent applications for the round towel

configuration that had been submitted by CLM.  *Id*.

CLM submitted a response to the First Office Action addressing the concerns of the

USPTO and offering support for its position that the Round Towel Mark was distinctive, had

acquired secondary meaning, and was therefore entitled to registration.  Pl. SOF ¶ 15.  Among

the documents submitted to the USPTO in response to the First Office Action was a copy of a

design patent application for the round towel configuration submitted by Franek.  *Id*. ¶ 16.  The

USPTO issued a Priority Office Action requesting still further information including

commercials of the round beach towel and sales figures which later were provided by CLM.  *Id*.

¶¶ 20-21.

The USPTO withdrew its original rejection of CLM's application because CLM had

overcome the concerns based on the "configuration" of the Round Towel Mark being "merely

descriptive of the goods." Pl. SOF ¶ 22. The USPTO approved and published CLM's Round Towel Mark in the Official Gazette on April 5, 1988. *Id*. ¶ 23. A corporation requested an extension of time to file an opposition to the federal registration, but that request was withdrawn on May 24, 1988. *Id*. ¶ 24. The USPTO registered the Round Towel Mark as U.S. Trademark Registration 1,502,261 (the '261 trademark) on August 30, 1988. *Id*. ¶¶ 5, 25. The USPTO has accepted the Trademark's Section 15 Declaration making it incontestable. Def. SOF ¶ 7.

The Round Towel Mark originally was in the name of CLM using an assumed name of Son International. Def. SOF ¶ 4. Franek was President of CLM. *Id*. ¶ 5. CLM was dissolved on July 1, 1994. *Id*. ¶ 6. The rights to the '261 trademark registration were assigned, *nunc pro tunc*, from CLM (still dissolved at this point) to Franek. *Id*. ¶ 6; Def. SOF ¶ 5. Franek currently owns the '261 trademark, which has been used since the date of first use. Def. SOF. ¶¶ 1, 6. CLM and Franek have expended resources, time, and money to market and sell the round beach towels. *Id*. ¶ 9.[5] Franek has been involved in designing, marketing and selling beach towels – and specifically round beach towels – since 1985. *Id*. ¶ 10. CLM adopted the round shape of the towel to distinguish it from other beach towels and identify the beach towels as coming from a single source, namely CLM. *Id*. ¶¶ 11, 13. At the time that CLM began selling round beach towels, the vast majority of existing beach towels were rectangular or square in shape. *Id.* ¶¶ 11, 21. Rectangular and square beach towels had been used for decades prior to CLM's introduction of the round beach towel. *Id*. To the best of Franek's knowledge, no one was selling round beach towels prior to CLM's introduction of the round beach towel. *Id*. ¶ 12. CLM advertised the shape of its round towel in all of its advertisements and proclaimed it to be "the most radical

---

[5] Plaintiff points out in several instances that it served discovery requests on June 21, 2008 and never received a response or documents responsive to those requests. However, Plaintiff never sought to compel production of those documents or stay briefing on the summary judgment pending any response.

fashion item since the bikini." *Id*. ¶ 14.  It was also supported through advertisements such as "Bound to be Round" and "Don't be Square." *Id*. ¶ 15.

Jay Franco has referenced several utility patents which refer to or include circular towels:

- U.S. Patent No. 2,803,845 ('845 patent) entitled "Circular Towel" was filed on June 14, 1954, granted on August 27, 1957, and expired on August 27, 1974.  Pl. SOF ¶¶ 26, 49. The specification of expired patent '845 states that "[a]n object of this invention is to provide a towel which is constructed in circular form and includes means for suspending the same from a towel rack." *Id*. ¶ 28.  The '845 patent claimed:  "In combination, a towel and suspension means therefore comprising, a circular fabric body, a reinforcing disc for said body, a pair of cross straps positioned on said disc with the ends of said straps extending under the edge of said disc, stitching extending through said body, said disc and said straps securing said body, said disc and said straps together, with said disc disposed centrally of said body, and adjustable elastic suspension member extending under said crossed straps for suspending said body, and means joining the opposite ends of said elastic suspension members to form a closed loop." *Id*. ¶ 29. The '845 patent only refers to fabric having a circular or disc shape. *Id*. ¶ 30. Figure 1 of 'the '845 patent shows a circular configuration. *Id*. ¶ 31.  The '845 patent also states "[t]he circular form of the towel body [] provides a relatively large area of toweling for use by small children and by suspending the body [] with an elastic strap or band the tapes [] and [] will not be placed under undue tearing strain if the towel is pulled laterally or downwardly with respect to rack bar []." *Id*. ¶ 32.

- U.S. Utility Patent No. 4,794,029 ('029 patent) entitled "Towel that Converts into a Bag" was filed on February 24, 1987 and granted on December 27, 1988.  Pl. SOF ¶ 33.  In the section entitled "Brief Summary of the Invention," the '029 patent states, that "[i]t is an object of

this invention to provide a circular section of woven terry fabric that when used as a towel for sunbathing requires no repositioning toward the changing angle of the sun." *Id*. ¶ 34.  The '029 patent specifies that "[t]he circular shape of the towel allows for the repositioning of the human body toward the changing angle of the sun while the towel remains stationary, thereby eliminating the need for continual repositioning of the towel as with the conventional rectangular sunbathing towel." *Id*.  Claim 2 of the '029 patent provides "[a] towel-bag construction as set forth in claim 1 wherein said towel is circular in shape, whereby a user while sunbathing may reposition his or her body towards the changing angle fo the sun while the towel remains stationary." *Id*. ¶ 35.  Figure 1 of the '029 utility patent shows a circular towel configuration. *Id*. ¶ 36.

- French Utility Patent No. 2,399,229 ('229 French patent) was granted on April 9, 1979.  Pl. SOF ¶ 37.  The '229 French patent states that "[t]he towel or cloth suspended from a hook is designed to have the shortest possible hanging length, and is therefore pref. circular." *Id*. ¶ 38.  Figure 1 of the '229 French patent illustrates a circular configuration. *Id*. ¶ 39.

- U.S. Utility Patent No. 4,991,978 ('978 patent) entitled "Towel Bag Combination Apparatus" was filed on January 16, 1990 and was granted on February 12, 1991.  Pl. SOF ¶ 40. Under the "Summary of the Invention," the '978 patent states that "[t]he invention is directed to a towel-bag apparatus which is adapted to move easily between an open position wherein a generally circular fabric towel element provides a towel for drying purposes or to be laid on the beach for sunning purposes and to a closed or partially closed position with the employment of a draw cord on the generally circular towel element to provide an enclosed bag, and further with the draw cord also providing a carrying strap for the bag.  In particular, the towel bag apparatus of the invention employs the generally circular fabric towel element such as terrycloth, having a

reinforced peripheral web and a plurality of draw holes, such as of metal and plastic grommets, in the reinforced web." *Id.* ¶ 41.  The specification of the '978 patent states that "[t]he drawings illustrate a towel-bag apparatus [] of the invention which comprises a generally circular terrycloth towel fabric [] having a diameter of 4 to 6 feet and a generally reinforced fabric or canvas peripheral 1" to 1½" webbing * * *." *Id.*

Claim 1 of the '978 patent provides "[a] towel-bag apparatus which is adapted to move between an open and closed position and which in the open position provides a towel suitable for drying and beach purposes, and in the closed position provides an enclosed bag with a carrying strap, and which towel-bag apparatus comprises in combination: (a) a generally circular, fabric towel element having a reinforced peripheral web and a plurality of holes in the web and having a top surface and a bottom surface, the bottom surface having a generally centrally reinforced section; (b) a loop means generally centrally secured to the reinforced section; (c) a ring means secured to the reinforced peripheral web; and (d) a draw cord means having a one and an other end, the draw cord passing through the holes in the reinforced web of the towel element, so as to permit the circular towel element to move between an open position for towel or beach with the draw cord in a relaxed, extended position use and a closed position for bag use with the draw cord in a drawn position, the draw cord means including a clip-type enclosure means at the one end and the other end so as to permit the said clip-type enclosure means to engage the loop means or the ring in the closed position to form a carrying strap for the towel-bag apparatus." Pl. SOF ¶ 42.  Claim 2 of the '978 patent reads "[t]he towel bag apparatus of claim 1 wherein the generally circular towel element has a diameter of from four to six feet and wherein the reinforced section is generally circular and has a diameter from about six to eighteen inches." *Id.* Claim 7 of the '978 patent states that "[a] towel-bag apparatus adapted to be placed in an open

position which provides a towel suitable for beach or drying purposes and in the closed position provides an enclosed bag with a carrying strap, and which towel-bag apparatus compromises in combination: (a) a generally circular, terrycloth towel element having a diameter of about 4 to 6 feet and having a reinforced peripheral web edge and plurality of holes in the web and having a top surface and a bottom surface, the bottom surface having a generally circular reinforced section of a non-terrycloth-type material and having a cloth loop centrally secured to the reinforced section and a ring secured to the reinforced peripheral web; and (b) an elastic-type draw cord means having a one and the other end and passing through the holes in the web in an alternating fashion so as to permit the circular towel element to move between the open position for towel-beach use and a closed position for bag use, the draw cord means including a spring laded clip at the one end and the other end so as to permit the draw cord means to pass through the loop and the spring loaded clip to engage the ring in the closed position to form a carrying strap for the towel-bag apparatus in the closed position." *Id*. Figure 2 of the '978 patent illustrates a circular configuration. *Id*. ¶ 43.

- U.S. Utility Patent No. 3,660,861 ('861 patent) entitled "Combination Round Towel and Holder" was filed on January 6, 1970 and granted on May 9, 1972. Pl. SOF ¶ 44. The '861 patent states that "[i]n accordance with the present invention, there is provided, in combination, a towel substantially circular in outline configuration detachably anchored to a support adjacent the towel's geometric center." *Id*. ¶ 46. The '861 patent specifies that "the towel [] is circular in outline configuration as illustrated in FIG. 4 and because of this shape the inner surface of the towel does not become exposed when the towel is suspended from its geometric center. The '861 patent permits a user to have a towel that is decorative on one surface only without detracting from the appearance when suspended from a hanger in a

washroom.  The circular towel, accordingly, is a decorative item having a neat appearance.  The circular towel also has the advantage of being able to be suspended from a minor area portion such that it can remain attached to a hanger leaving the major portion of the towel area for use in drying hands.  *Id*. ¶ 48.  Claim 1 of the '861 patent provides "[i]n combination: (a) a hangar including a first portion for anchoring the same to a support and a second portion detachably connectable to an article and including a conically shaped member with an undulating outer surface, said undulations being transverse to the longitudinal axis of said member, facilitating forming folds in a sheet of material suspended therefrom; and (b) a circular towel detachably connected to said portion of said hanger."  *Id*. ¶ 47.

On January 3, 2008, Franek filed suit in this judicial district against Walmart and Target (both Jay Franco's customers), but not against Jay Franco.  Pl. SOF ¶ 8.  Franek alleged that Walmart's and Target's past advertisements, sales, purchasing, and marketing of round beach towels have violated Franek's alleged rights to trademark '261.  *Id*.  Jay Franco claims to be the vendor to Walmart and Target for the round beach towels in question and, by way of indemnification agreements with those retailers, has agreed to hold harmless and defend them.  *Id*. ¶ 9.

The round beach towels sold by CLM and subsequently by licensees and Franek are made using square towel stock from which the material is cut in a circular pattern and hemmed.  Def. SOF ¶ 24.  According to Franek, there are no inherent advantages from a cost perspective in making a round beach towel and removing the excess material results in waste.  *Id*. ¶¶ 25-26.  The round towel is made of cotton.  *Id*. ¶ 26.  According to Franek, a round beach towel does not

consume less physical space when the towel is folded up as opposed to towels of the same surface area.  *Id*. ¶ 29.[6]

When applying for the trademark that became '261, CLM submitted to the USPTO an advertisement for the "Round-up new Sonspot beach towel" as an example of the Round Towel Mark's actual use in the marketplace.  Pl. SOF ¶ 55.  That advertisement stated "Find your spot in the sun without moving your towel around."  *Id*. ¶ 56.  One of the advertisements states "NOW WHEN THE SUN MOVES, YOUR TOWEL DOESN'T HAVE TO – The round shape eliminates the need to constantly get up and move your towel as the sun moves across the sky. Instead merely reposition yourself."  *Id*. ¶ 58.  A separate advertisement proclaimed: "Introducing the Sonspot™ from Springmaid, the great new beach towel line that's going to have everybody going around in circles!  These unique round towels stay put on the beach while sun-worshippers rotate to follow the sun."  *Id*. ¶ 60.  CLM's Son International "HUGE ROUND BEACH TOWEL" advertisement showed a picture of the towel and stated it was a "LUXURIOUS BEACH TOWEL – for LYING. NEARLY 6 FEET IN DIAMETER"; that it was "The World's Greatest Beach Towel"; and "Now when the sun moves, your towel doesn't have to.  One for lying, one for drying!  Bound to be round!  Don't be square!"  The round shape of the Sonspot® is a trademark of Son International."  *Id*. ¶ 62; Def. SOF ¶ 16.

Franek states that the ability to reposition a person's body is dictated by the surface area of a beach towel and not its shape.  Def. SOF ¶¶ 17, 23.  Franek further states that the average person could just as easily reposition their body on a six-foot square (or other non-circular shapes) beach towel as on a round towel.  *Id*. ¶¶ 18-19.  Beach towels, in fact, come in many configurations and many alternatives exist for the design of beach towels.  *Id*. ¶¶ 20-21.  Franek

---

[6] Third party vendors, not including those at issue in this case, have sold and continue to sell round or circular shaped beach towels.  Pl. SOF ¶ 52; Def. SOF ¶ 27.  Franek claims that his attorney sent a cease and desist letter to one of those retailers.  *Id*. ¶ 28.

goes on to state that any configuration of towel, if provided the appropriate surface area, would allow a person to move about the towel without repositioning themselves. *Id*. ¶ 22.

## III. Analysis

### A. Standard of Review

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette,* 359 F.3d 925, 928 (7th Cir. 2004).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be

evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252.

**B.      Jurisdiction**

Franek's Answer to Plaintiff's Complaint denies that this Court has subject matter jurisdiction.   Although Franek does not state the basis for his position, the Court retains an independent duty to ensure that jurisdiction exists.

Jay Franco brought this action seeking a declaratory judgment that it did not infringe any valid trademarks or trade dress and an order cancelling Franek's trademark.   "The Declaratory Judgment Act, 28 U.S.C. § 2201, allows federal courts, in their discretion, to render declaratory judgments only where there exists an actual controversy: the latter requirement is a 'jurisdictional prerequisite of constitutional dimensions.'"   *Trippe Mfg. Co. v. Am. Power Conversion Corp.*, 46 F.3d 624, 627 (7th Cir. 1995) (quoting *Crown Drug Co., Inc. v. Revlon, Inc.*, 703 F.2d 240, 242-243 (7th Cir. 1983) (internal citations omitted)).   The Declaratory Judgment Act ("DJA") is not, in itself, a source of federal subject matter jurisdiction, and therefore the Court must possess an independent basis for jurisdiction.   See *Geisha, LLC v. Tuccillo*, 525 F. Supp. 2d 1002, 1009 (N.D. Ill. 2007) (citing *GNB Battery Techs., Inc v. Gould, Inc.*, 65 F.3d 615, 619 (7th Cir. 1995) (citation omitted)).   The DJA merely provides an additional remedy when subject matter jurisdiction already exists.   See Charles Alan Wright, *The Law of Federal Courts* § 100 (5th ed. 1994).   Where that independent basis is present, "[t]he sole requirement for jurisdiction under the Act is that the conflict be real and immediate, i.e., that there be a true, actual 'controversy' required by the Act."   *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 96 (1993) (quoting *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 731-735 (Fed. Cir. 1988)).

Although it is unclear whether the suggestion in Franek's answer rests on a perceived lack of "controversy" for DJA purposes or an absence of independent subject matter jurisdiction, the Court concludes that both are present.   Franco invokes subject matter jurisdiction under several sections including: federal question jurisdiction pursuant to 28 U.S.C. § 1331, diversity jurisdiction under 28 U.S.C. § 1332, as well as the jurisdiction-enabling statutes relating to trademarks and unfair competition pursuant to 28 U.S.C. §§ 1338(a)-(b).   At a minimum, it is clear this Court has subject matter jurisdiction pursuant to §§ 1331 and 1338 because the action arises under the Lanham Act and the crux of the dispute involves a federally registered trademark.   See *Berlin Packaging, LLC v. Stull Techs., Inc.*, 381 F. Supp. 2d 792 (N.D. Ill. 2005); *Morton Grove Pharms., Inc v. Par Pharms. Cos., Inc.*, 2006 WL 850873 (N.D. Ill. Mar. 28, 2006) (patent infringement).

To the extent that Franek's position is based on a perceived lack of case or controversy, the Court disagrees.   The United States Supreme Court recently discussed the standard for establishing jurisdiction over a declaratory judgment action in *MedImmune, Inc v. Genentech, Inc.*, 549 U.S. 118 (2007).   Although admittedly not the "brightest of lines," the DJA requires courts to ensure:

> the dispute be definite and concrete, touching the legal relations of parties having adverse legal interests; and that it be real and substantial and admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts * * *. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

*MedImmune*, 549 U.S. at 127 (internal citations omitted).[7]

---

[7] While *MedImmune* arose in the patent context, trademark law historically has been treated in a similar manner, especially in regard to declaratory judgments.

This case does present facts giving rise to a substantial controversy between Jay Franco and Franek.  The parties have adverse legal interests of sufficient immediacy and reality to warrant a declaratory judgment if it is found to be proper.  Franek previously alerted Jay Franco to Franek's position that the towels Jay Franco was selling infringed the Round Towel Mark.  In addition, Franek has filed suit against retailers who purchased the allegedly infringing towels from Jay Franco.  The counterclaims that Franek has asserted against Jay Franco also show that a case or controversy exists.  "A useful question to ask in determining whether a[] [substantial] controversy exists is what, if any, cause of action the declaratory judgment defendant may have against the declaratory judgment plaintiff."  *Publ'ns Int'l, Ltd. v. Leapfrog Enters., Inc.*, 2008 WL 5142286, *2 (N.D. Ill. Dec. 4, 2008) (quoting *Benitec Austl., Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1344 (Fed. Cir. 2007)).  In this case, the declaratory judgment defendant brought a four-count counterclaim against the declaratory plaintiff alleging infringement and fraud regarding the very same trademark the declaratory plaintiff seeks to invalidate.  A controversy exists for DJA purposes because the dispute between these two parties satisfies the *MedImmune* standard.

### C.     Legal Standards under Trademark Law

Jay Franco seeks to invalidate Franek's registered '261 trademark on the grounds that it is functional.  While it often is written that functionality of a trademark is a question of fact (see, *e.g.*, *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277 (7th Cir. 1998); *Fuji Kogyo Co., Ltd. v. Pacific Bay Int'l, Inc.*, 461 F.3d 675, 681 (6th Cir. 2006); *Valu Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d 1268 (Fed. Cir. 2002)), that question "is subject to resolution on a summary judgment motion" in appropriate cases.  *Global Manufacture Group, LLC v. Gadget Universe.com*, 417 F. Supp. 2d 1161, 1167 (S.D. Cal. 2006) (citing *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158

F.3d 1002, 1006 (9th Cir. 1998)); see also *Thomas & Betts*, 138 F.3d at 297 (noting that summary judgment may be proper "if the defendant can demonstrate that the element sought to be protected is functional"); *Invisible Fence, Inc. v. Perimeter Techs., Inc.*, 2007 WL 273129, at *8 (S.D. Ind. Jan. 26, 2007) (granting summary judgment where defendant "fail[ed] to create a genuine issue of material fact that the feature at issue here is nonfunctional").  In fact, in *TrafFix* – a case cited prominently in both sides' briefs – on remand from the Supreme Court, the Sixth Circuit affirmed the district court's grant of summary judgment on the plaintiff's trade dress claim on functionality grounds.  *Mktg. Displays, Inc. v. TrafFix Devices, Inc.*, 11 Fed. Appx. 547, 547-48, 2001 WL 630049, at *1 (6th Cir. May 31, 2001).[8]  The upshot is that any disputes of material fact on the functionality question will preclude summary judgment.

Although the '261 trademark is defined as "incontestable" pursuant to 15 U.S.C. § 1065, that does not prevent an invalidity challenge.  As the Seventh Circuit has explained, "[t]he words 'incontestable' and 'exclusive' sound more impressive than the legal rights that the Lanham Act actually conveys.  * * *  [I]ncontestability does not avoid the question whether the [trademark or trade dress] is functional."  *Eco Mfg. LLC v. Honeywell Int'l Inc.*, 357 F.3d 649, 651 (7th Cir. 2003).  In other words, "incontestable" is reduced to a term of art when, as here, Jay Franco's challenge to the mark arises under 15 U.S.C. § 1064(3).  See 15 U.S.C. § 1065 ("Except on a ground for which application to cancel may be filed at any time under paragraph (3) * * * of section 1064 of this title * * * the right of the registrant to use such registered mark * * * shall be incontestable").

Having established that Jay Franco is free to challenge the mark despite registration, the question shifts to the burden of proof on the issue of functionality.  The Lanham Act provides

---

[8] The Supreme Court opinion issued prior to remand (*TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23 (2001)), is discussed in great detail below.

that the registration of a trademark grants the owner the benefit of a rebuttable presumption that

the mark is valid:

> [A] mark registered on the principal register * * * shall be prima facie evidence of the validity of the registered mark * * * and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein, but shall not preclude another person from proving any legal or equitable defense or defect including those set forth subsection (b) of this section which might have been asserted if such mark had not been registered.

15 U.S.C. § 1115(a).  One of the affirmative defenses referenced in Section 1115 is invalidity

based on a mark's functionality, which is the affirmative defense at issue.  See 15 U.S.C. §

1115(b)(8).  The burden of proof in a challenge to the functionality of a trademark or trade dress

rests with the party seeking to invalidate the registered mark.  See *Specialized Seating, Inc. v.*

*Greenwich Indus., L.P.*, 472 F. Supp. 2d 999, 1011-1012 (citing *Publ'ns Int'l, Ltd. v. Landoll,*

*Inc.*, 164 F.3d 337, 339-340 (7th Cir. 1998) ("registration creates a presumption of validity,

implying that the defendant has the laboring oar on all issues relating to validity, including

functionality")).

Therefore, at least initially, the burden rests on Jay Franco because the registration makes

out a *prima facie* case of functionality.[9]  However, "[t]he presumption of validity that federal

registration confers * * * evaporates as soon as evidence of invalidity is presented.  Its only

function is to incite such evidence, and when the function has been performed the presumption

drops out of the case."  *Door Sys. Inc. v. Pro-Line Door Sys. Inc.*, 83 F.3d 169, 172 (7th Cir.

1996) (internal citations omitted).  That does not mean that the burden has shifted from Jay

Franco on its affirmative defense.  But upon the presentation of strong evidence that a mark is

---

[9] The Seventh Circuit refers to this synonymously as a "presumption of validity."  See *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 936 (7th Cir. 1986); *Door Sys. Inc.*, 83 F.3d at 172.

functional and invalid, a "heavy burden" is imposed on the holder of the mark to prove non-functionality.  As the Supreme Court has explained,

> [a] utility patent is strong evidence that the features therein claimed are functional.  If trade dress protection is sought for those features the strong evidence of functionality based on the previous patent adds great weight to the statutory presumption that features are deemed functional until proved otherwise by the party seeking trade dress protection.  Where the expired patent claimed the features in question, one who seeks to establish trade dress protection must carry the *heavy burden* of showing that the feature is not functional, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device.

*TrafFix*, 523 U.S. at 29-30 (emphasis added).[10]  Therefore, if Jay Franco has in fact introduced utility patents meeting the *TrafFix* standard, then Franek would have a "heavy burden" of showing the circular feature of its towel is not functional, "for instance by showing that [the circular shape] is merely an ornamental, incidental, or arbitrary aspect."  Whether Jay Franco in fact has provided such evidence is discussed below; absent such evidence the burden remains on Jay Franco.

"A product's appearance can serve as a trademark to the extent that design identifies the product's maker.  But a functional aspect of the design cannot be trademarked, even if it also (at least before the competition breaks out) identifies the product's name."  *Eco Mfg.*, 357 F.3d at 651 (internal citations omitted).  Under the "traditional rule," a product feature is functional if it is essential to the use or purpose of the product or if it affects the cost or quality of the product.  *TrafFix*, 532 U.S. at 32 (quoting *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 165 (1995) (citing *Inwood Labs., Inc v. Ives Labs., Inc.*, 456 U.S. 844, 850 (1982))).  The Court also referred to an extension of the "traditional rule" in cases of esthetic functionality.  *Id.*  In such

---

[10] As the language quoted above indicates, *TrafFix* involved a party seeking trade dress protection without a registered trademark.  The Seventh Circuit, however, has applied that portion of *TrafFix* to parties who already have trademark protection and therefore are not "seeking it."  See *Eco Mfg.*, 357 F.3d at 653 (noting, albeit reviewing a preliminary injunction, that the trademark holder bears a "heavy burden" based on expired utility patents).

cases, it is "proper to inquire into a 'significant non-reputation-related disadvantage'" (i.e. the "competitive necessity test"). *Id*. (quoting *Qualitex*, 514 U.S., at 165). However, if functionality is present under the "traditional rule," there is no need to proceed to the "competitive necessity test" and also no need to explore the existence of alternative designs available to competitors. *TrafFix*, 523 U.S. at 33-34; see also *Specialized Seating*, 472 F. Supp. 2d at 1010. Finally, the Seventh Circuit has interpreted the traditional rule laid out in *TrafFix* to reject "an equation of functionality with necessity; it is enough that the design is useful." *Eco Mfg.*, 357 F.3d, at 654-655.

In a recent and comprehensive decision, Chief Judge Holderman reiterated the frequently used, multi-factored test used by many courts in determining whether a product feature is functional. See *Specialized Seating*, 472 F. Supp. 2d 999. These factors include: "(i) the existence of a utility patent, expired or unexpired, that involves or describes the functionality of an item's design element; (ii) the utilitarian properties of the item's unpatented design elements; (iii) advertising of the item that touts the utilitarian advantages of the item's design elements; (iv) the dearth of, or difficulty in creating, alternative designs for the item's purpose; and (v) the effect of the design feature on an item's quality or cost." *Id.* at 1011 (citing *TrafFix*, 532 U.S. at 29; *Inwood Labs., Inc.*, 456 U.S. at 850; *Publ'ns Int'l, Ltd.*, 164 F.3d at 339; *W.T. Rogers Co., Inc v. Keene*, 778 F.2d 334, 340 (7th Cir. 1985); *In re Morton-Norwich Prods., Inc.*, 671 F.2d 1332, 1341 (C.C.P.A. 1982)).

Before proceeding to consideration of those factors, it may be useful to frame the precise functionality issue before the Court. Franek contends that the function of his towel is to separate sunbathers from the ground. That is true of all beach towels, regardless of their shape, in a general sense. But, in the words of the author of a leading treatise, "[t]he true question is: is the

article in this particular shape for utilitarian reasons?  For example, is it shaped this way because it makes it easier to hold, cheaper to make, more durable in transit or stronger in construction?" 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 7:70 (4th ed. 2008).  In other words, the correct inquiry is whether or not the article reflects a utilitarian design of a utilitarian object.  See *Morton-Norwich*, 671 F.2d at 1338.  Or, put more concretely, the issue for decision is whether the trademarked towel, which separates sunbathers from the ground, has a separate function based on its circular shape.  The Seventh Circuit in fact has commented on this kind of distinction:

> [S]ome articles, made in a purely arbitrary configuration may *perform* a function * * * which could equally well be served by containers of many other shapes, and in such circumstances the *incidental* function should not by itself preclude trademark registrability if the other conditions precedent are present.  That is a quite different situation from a configuration whose purpose is to provide a functional advantage.  Where such a functional purpose exists, the rule is * * * that the configuration is not registrable as a trademark.

*Thomas & Betts Corp.,* 138 F.3d at 288 (quoting *Best Lock Corp. v. Schlage Lock Co.*, 413 F.2d 1195, 1199 (C.C.P.A. 1969) (internal citation omitted)).

### 1.    Utility Patent

Of all the factors that courts consider in examining functionality, the existence of a prior (or contemporaneous) utility patent may be the most important, because it has a direct impact on the burden of proof.  A prior utility patent is strong evidence that the features claimed in trade dress or trademark are functional and places a "heavy burden" on the trademark owner or seeker to show non-functionality.  *TrafFix*, 523 U.S. at 29.  However, that burden will be imposed only if a "central advance" of the utility patent overlaps with an "essential feature" of the trade dress or trademark.  *Id.*; see also *Berlin Packaging, LLC v. Stull Techs., Inc.*, 381 F. Supp. 2d 792, 802 (N. D. Ill. 2005).  Moreover, even if that kind overlap is present, the heavy burden can be

overcome by showing that the feature is "merely an ornamental, incidental, or arbitrary aspect of the device." *TrafFix,* 523 U.S. at 30. Jay Franco points the Court to four United States utility patents and a French patent, none of which was owned by Franek, in support of its contention that the *TrafFix* standard has been met here.

As an initial matter, the Court rejects Franek's argument that because he did not own any of the utility patents referenced by Jay Franco, there is no need to undertake a utility patent analysis. To be sure, in *TrafFix* (and in many other cases), the party seeking trademark or trade dress protection previously held the utility patent at issue. See, *e.g.*, *Berlin Packaging*, 381 F. Supp. 2d 792; *Eco Mfg.*, 357 F.3d 649; *Specialized Seating,* 472 F. Supp. 2d 999. While this distinguishes *TrafFix* factually, it does not preclude application of the rule in that case. Although it may make comparison easier, "[t]he key is not who owns these patents, but rather what they disclose." *In re Vishrup*, 42 U.S.P.Q. 2d 1403, 1405 (T.T.A.B. 1997); see also *McCarthy on Trademarks and Unfair Competition*, § 7:89.30 ("A functional utility patent is strong evidence of functionality regardless of who owns or owned the patent").

Before analyzing the individual patents, the Court must define the parameters of its assessment. At one point in the opinion, *TrafFix* appears to limit the consideration of utility patents to its claims: "[a] utility patent is strong evidence that the features therein *claimed* are functional"; "[w]here the expired patent *claimed* the features in question, one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional." *TrafFix*, 532 U.S. at 29-30 (emphasis added). The Court nonetheless proceeded to examine the specifications and patent prosecution history of the utility patent at issue and noted that if a manufacturer argues that aspects claimed in a utility patent are arbitrary, incidental, or ornamental, the inquiry "could be aided by going beyond the claims and examining the patent

and its prosecution history to see if the feature in question is shown to be a useful part of the invention." *Id*. at 31-32, 34.   Therefore, under *TrafFix*, to the extent that Franek argues that the inclusion of the circular feature is arbitrary or not necessarily a useful part of the invention, the Court may delve beyond the claims in the utility patents.  See *Berlin Packaging*, 381 F. Supp.2d 792; see also *McCarthy on Trademarks and Unfair Competition*, § 7:89.30 ("[A] utility patent must be examined in detail to determine whether the disclosed configuration is really primarily functional or just incidentally appears in the disclosure of a patent.  There is no doubt that many nonfunctional shapes and configurations happen to be described or pictured as an incidental detail in functional patents.").

The essential feature of Franek's trademark clearly is the round shape of the beach towel. Franek essentially concedes this point by arguing that "[i]n each asserted patent the 'central advance' is **not** a round beach towel."  Resp. at 11.  Therefore, all that is required to impose on Franek the heavy burden of showing non-functionality is a determination that one of the five utility patents has an overlapping central advance of a round beach towel.  Jay Franco appears to argue that the central advance of all of the utility patents that it has cited is the circular shape of the towels.  See Pl. MSJ at 8 (the utility patents "claim, disclose, and show the functionality of the same circular towel configuration as depicted in Franek's U.S. Trademark Reg. No. 1,502,261").  Franek counters that the central advances of the patents are "features that enhance a person's convenience in transporting, storing and/or hanging a towel."  Resp. at 10.

The Court reads *TrafFix* to require that the feature claimed in the utility patent be functional for the same purpose that is employed in the trademark.  In *TrafFix*, the dual spring design at issue was included in the utility patent because it was useful in keeping traffic signs upright in adverse weather conditions.  *TrafFix*, 523 U.S. at 31.  That is the same purpose for

which trade dress protection was sought.  *Id*. at 30-31.  It was not the mere use of two springs that created the presumption of functionality, but rather the employment of two springs for the same purpose that they were claimed in the patent.  A pre-existing utility patent was no bar to a company receiving trademark or trade dress protection for a product that has nothing to do with traffic signs or topple prevention simply because it contains two springs (although it certainly may be functional for different reasons).  If a television manufacturer wanted to differentiate its product by placing two springs on top of the screen in order to differentiate its product, MDI's patent would be no obstacle.

Applying the reasoning of *TrafFix* to this case, although each of the patents involves a circular towel, only one of them – U.S. Utility Patent No. 4,794,029 ('029 patent) entitled "Towel that Converts into a Bag" – claims a circular *beach* towel.  Franek contends that the '029 patent cannot be considered at all because Franek began using his trademark a year before the '029 patent was even filed, and that patent thus could not have "anticipated the claimed functionality of Defendant's trademark."  Resp. at 11.  But Franek provides no legal support for that argument, and the Court sees no rationale for limiting *TrafFix* in the manner that Franek suggests, because the issue is functionality, not anticipation.  In addition, although it is not clear from the record whether the '029 patent has expired, the courts and leading treatises agree that any such a distinction would be legally irrelevant in any event.  See *Specialized Seating*, 472 F. Supp. 2d at 1011 ("the existence of a utility patent, expired *or unexpired*, that involves or describes the functionality of an item's design element"); see also McCarthy § 7:89.30 ("Whether the utility patent in evidence is active or has expired is of no significance to its evidentiary weight as to the functionality of the configuration at issue").  The Federal Circuit has even considered abandoned patent applications.  *Valu Eng'g*, 278 F.3d at 1279 (although the

patent never was issued, it has "evidentiary significance for the statements and claims made in the patent application concerning the utilitarian advantages, just as an issued patent has evidentiary significance.")  In the present case, although the '029 patent may not have expired and was issued after Franek began using the mark – though before the trademark was registered – the USPTO issued a patent claiming the feature at issue.  The Court therefore will consider the '029 patent in its functionality analysis.

The '029 patent claims, *inter alia*: "(1) A towel-bag construction comprising: a non-rectangular towel; a casing formed at the perimeter of said towel; a cord threaded through said casing; and a section of relatively non-stretchable fabric of a shape geometrically similar to that of said towel attached with its edges equidistant from the edges of said towel. (2) a towel-bag construction as set forth in claim 1 *wherein said towel is circular in shape whereby a user while sunbathing may reposition his or her body towards the changing angle of the sun while the towel remains stationary*."  (Emphasis added.)  Based on the language in Claim 2, the circularity of the beach towel clearly is important to the '029 patent. The Court will look beyond the claims to ensure the shape is not merely arbitrary or incidental.  The preferred embodiment "provides a towel that when used for sunbathing requires no repositioning toward the changing angle of the sun and may also be converted into a bag for transporting various and sundry sunbathing  articles * * *."  It is therefore clear, both from its inclusion in the claims (see McCarthy § 7:89 "[N]on-functional elements should not appear and do not appear in patent claims") and as a preferred embodiment, that the towel's circular shape and its use for sunbathing is not merely incidental to the '029 patent, but central to the product.

The question remains whether the circular beach towel is a "central advance" of the '029 patent.  To answer that question, the "brief summary of the invention" is instructive:

> It is an object of this invention to provide *a circular section of woven terry fabric that when used as a towel for sunbathing purposes requires no repositioning toward the changing angel of the sun*.  It is a further object of this invention to provide a cotton cord or drawstring contained in four sections of woven terry fabric casing cut on the bias and attached to the perimeter of the circular section of woven terry fabric on both the superior and interior planes permitting the conversion of the material into a bag.

(Emphasis added.)  It appears from the summary that the central advance of the '029 patent is a circular beach towel that can be converted into a bag.  To say, as Franek does, that the central advance is solely a "feature[] that enhance[s] a person's convenience in transporting a towel" ignores one of the declared objects of the invention and the express language of the claims.  Under the present facts, the essential feature of the trademark is a circular beach towel (X) and the central advances of the '029 patent are a circular beach towel (X) that can be converted into a bag (Y).  It would present a cleaner, simpler situation if the Court could compare essential feature X with a single central advance X rather than central advances X and Y.  But given the the way in which the claims, the preferred embodiment, and the summary of the '029 patent are set forth, any attempt to separate or to rank the advances associated with the circular shape and the ease of transport of the subject beach towel would be strained and artificial.  And because a single overlapping utility patent may constitute "strong evidence" of functionality (*TrafFix*, 532 U.S. at 29-30), Franek must carry the "heavy burden" of showing that the circular feature of the beach towel is not functional.[11]

---

[11] The other patents cited by Jay Franco do not appear to provide much support for its functionality argument. The '978 patent entitled "Towel Bag Combination Apparatus" comes closest in that it claims a "generally circular" towel.  However, the shape of the towel appears incidental to the primary function of the apparatus.  The central advances of the remaining patents do not appear to overlap with the essential function of Franek's trademark.  The '861 patent involves the suspension of circular *bathroom* towels; the French patent is similar to the '861 patent and in any event the Court would be reluctant to extend *TrafFix* to the consideration of foreign patents without any supporting precedent; and finally the '845 patent involves a *bathroom* towel.  However, in view of the Court's analysis and conclusions as to the '029 utility patent, the Court need not actually decide whether any of the other patents contains a central advance that overlaps with an essential feature of Franek's trademark.

### 2. Utilitarian Properties of the Towel's Unpatented Design Elements

The Court has already determined that the circular shape of the beach towel was a central advance of the '029 patent.  Any other design elements of the towels (e.g. images or colors) would not have contained any utilitarian properties, nor has Jay Franco argued to the contrary.

### 3. Advertising of the Towel that Touts the Utilitarian Advantages of the Towel's Design Elements

The record in this case shows that Franek's advertisements have touted the advantage of the circular configuration of the towel in that it permits sunbathers to reposition their bodies on the towel in order to get direct tanning exposure from the sun without having to move the towel. An advertisement submitted to the USPTO when seeking registration stated, among other things, "Find your spot in the sun without moving your towel around."  Pl. SOF ¶ 56.  Other advertisements proclaimed: "NOW WHEN THE SUN MOVES, YOUR TOWEL DOESN'T HAVE TO – The round shape eliminates the need to constantly get up and move your towel as the sun moves across the sky.  Instead merely reposition yourself"; "Introducing the Sonspot™ from Springmaid, the great new beach towel line that's going to have everybody going around in circles!  These unique round towels stay put on the beach while sun-worshippers rotate to follow the sun."; and "Now when the sun moves, your towel doesn't have to.  One for lying, one for drying!  Bound to be round!  Don't be square!"  The round shape of the Sonspot® is a trademark of Son International."  *Id.* at ¶¶ 58, 60, 62.

Franek attempts to dismiss these statements as "puffery" and submits that they cannot be determinative of the functionality of the round beach towel.  But those contentions are not persuasive.  Although advertisements themselves may not be solely determinative of a product's functionality, it is well established that "advertising of the item that touts the utilitarian advantages of the item's design elements" is a pertinent consideration in a court's functionality

analysis.  *Specialized Seating*, 472 F. Supp. 2d at 1011.  It is clear from the advertisements that

the ability to reposition without moving the towel was one of the angles that CLM used to sell

the product.  Franek clearly believed at the time that the circular feature, and the capabilities

inherent in that shape, would encourage sales of the beach towel or he would not have so

conspicuously included that language in the advertisements.  Franek contends that the

advertisements for the towel were focused on the unique shape of the round beach towel, not the

ability to reposition the user without moving the towel.  It is true language focusing on the shape

of the towel also was employed.  However, the utilitarian advantage included in advertisements

need not be the sole, or even the principal, focus of the campaign.  That a company chooses to

highlight non-functional aspects of its product does not negate the existence of the other

advertisements that tout the functional aspects.  This factor merely requires examination of

whether functionality – that sunbathers did not have to reposition the towels as the sun moved

through the sky – was included as a selling point.  It plainly was, and that factor further supports

a finding of functionality.[12]

> **4.**     **The Dearth of, or Difficulty in Creating, Alternative Designs for the Towel's Purpose**

There has been some question whether consideration of alternative designs is required –

or even appropriate in all instances – after *TrafFix*.  See *Valu Eng'g*, 278 F.3d at 1276.  That

uncertainty has its genesis in the Supreme Court's statements that when the "design is functional

---

[12] Puffing is defined as "[t]he expression of an exaggerated opinion – as opposed to a factual misrepresentation – with the intent to sell a good or service."  BLACK'S LAW DICTIONARY, 1269 (8th ed. 2004).  If anything, the non-utilitarian advertisements of the towel – for example, claiming that the towel is "the greatest fashion statement on the beach since the bikini" – more clearly fall within the rubric of "puffery" than do the utilitarian references.

under the *Inwood* formulation[13] there is no need to proceed further to consider if there is a

competitive necessity for the feature." *TrafFix*, 532 U.S. at 33.   The Court also noted that when

a product is deemed functional under the *Inwood* formulation, there is no need to engage in

speculation about other design possibilities.  See *id*.  One court attempted to read that language

consistently with the consideration of traditional factors:

> Nothing in *TrafFix* suggests that consideration of alternative designs is not
> properly part of the overall mix, and we do not read the Court's observations in
> *TrafFix* as rendering the availability of alternative designs irrelevant.  Rather, we
> conclude that the Court merely noted that once a product feature is found
> functional based on other considerations there is no need to consider the
> availability of alternative designs, because the feature cannot be given trade dress
> protection merely because there are alternative designs available.  But that does
> not mean that the availability of alternative designs cannot be a legitimate source
> of evidence to determine whether a feature is functional in the first place.

*Valu Eng'g, Inc.*, 278 F.3d at 1276.   The Court finds the Federal Circuit's synthesis to be

sensible and thus will consider evidence of alternative designs to probe whether the circular

towel is functional in the first instance.  See also *Specialized Seating*, 472 F. Supp. 2d at 1011

(listing this factor among those to be considered).

As established above, according to both Franek and the '029 patentee, the *circular*

towel's purpose is not merely to separate the sunbather from the ground – which, after all, is a

purpose of all beach towels regardless of their shape or size – but also to permit rotation of the

sunbather without moving the towel.  It is to this purpose that alternative designs will be judged.

Franek is absolutely correct that beach towels could be made in any design, and if large enough,

a sunbather would not have to reposition the towel while following the sun.   However, the

undisputed evidence before the Court indicates that there still are significant advantages to the

circular form.  Jay Franco's expert states that a circular towel is the most efficient shape to serve

---

[13] This is the traditional rule that a product feature is functional when it is "essential to the use of or
purpose of the article or if it affects the cost or quality of the article."  *TrafFix*, 532 U.S. at 32 (quoting
*Qualitex*, 514 U.S. at 165) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982)).

the purpose of avoiding the movement of the towel since it uses the least amount of area to achieve that function.  That assertion apparently is undisputed by Franek, because he did not respond to it in his own declaration although he responded to other assertions made by Jay Franco's expert.  If a circular design admittedly is the most efficient shape, then any other manufacturer of towels permitting rotation with the sun would be forced to manufacture sub-optimal towels.  That alone is sufficient to negate Franek's argument of alternative designs.  In fact, a design need not be the best designs available for its purpose; it need only be one of a few superior designs.  *Specialized Seating*, 472 F. Supp. 2d at 1013 (citing *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1189 (7th Cir. 1989)); see also *Publ'ns Int'l, Ltd.*, 164 F.3d at 339; *W.T. Rogers Co., Inc. v. Keene*, 778 F.2d 334, 340 (7th Cir. 1985).  Here, the evidence adduced at summary judgment indicates that Franek's design *is* the best from an efficiency standpoint.

Jay Franco's expert also states that the round shape uses less space when folded up. Franek's declaration in response states "it is simply not true that a round beach towel consumes less physical space when the towel is folded up *as opposed to towels of the same surface area*." (Emphasis added.)  This qualified response does not dispute the claim made by Jay Franco's expert.  It is undisputed that a circular towel is the most efficient shape to achieve its purpose. Therefore, for a non-circular towel to achieve the same purpose, *the surface area must be larger*. Moreover, Franek's hypothetical "same surface area" towel might not be capable of serving the intended purpose because it must sacrifice length or width to achieve that same area.  There is only one design – a circular one – that can achieve the purpose of the towel with the least surface area.  "Precluding a finding of functionality for a feature unless it was the best design would essentially allow the creation of a monopoly for all but the best version of a functional feature."

*Specialized Seating*, 472 F. Supp. 2d at 1013.  In this case, a monopoly would be created for *the best design* from an efficiency standpoint.

By comparison, the Court notes a Seventh Circuit decision in which the court found a shape included in a product's design to be non-functional and thus appropriate as trade dress.  In *W.T. Rogers Co.*, 778 F.2d at 343, the products at issue were plastic, stackable office trays with hexagonal end panels.  The lawsuit arose when a competitor attempted to manufacture and sell identical trays.  The court upheld the trade dress claim because the "hexagonal shape of the end panel does nothing to enhance the tray's utility in holding papers; the shape is as irrelevant to that function as the fluting in a column is irrelevant to the column's function of holding up the roof."  *Id*. at 342-343.  In so doing, the court contrasted the oval shape of a football, which the court believed to be a functional feature because it is something "costly to do without * * * rather than costly to have."  *Id*. at 339.  As the court summarized, if "the feature which assertedly gives a product distinctiveness is one 'of a few superior designs for its *de facto* purpose, it follows that competition is hindered' * * * and trademark protection will be denied."  *Id*. at 340.

To be sure, a circular shape is not as essential to the functionality of a beach towel as an oval shape is to the functionality of a football.  But it need not be indispensable; it is enough that circularity is one of a few superior designs for a beach towel.  Here, of course, the Court already has concluded that the circular shape is not irrelevant to the function.  In addition, even if no such functionality were present, *W.T. Rogers* suggests it may be inappropriate to remove such a basic shape from competition:

> The hexagon is not the only feasible shape for the side of a tray.  Moreover, we do not understand Rogers to be claiming the hexagon.  The hexagon is not a uniform shape, like a circle or a square or an equilateral triangle; it is any six-sided figure. Rogers has chosen a particular hexagon as the shape for its end panels, and a hexagon moreover with a hole in it.  The ensemble may well be distinct from a

number of other hexagonally shaped end panels, and if so the options of
competing manufacturers may be as a practical matter unlimited.

*W.T. Rogers*, 778 F.2d at 343.

In sum, the evidence indicates that although other shapes may provide the same benefit as

Franek's round towel, the circular shape is the most (or at least one of the most) efficient in that

it performs the intended function with the least surface area.   The alternative design analysis

thus bolsters the conclusion that the circular design of a beach towel is functional.   In the

Supreme Court's words, the "functionality doctrine prevents trademark law, which seeks to

promote competition by protecting a firm's reputation, from instead inhibiting legitimate

competition by allowing a producer to control a useful product feature."  *Qualitex*, 514 U.S. at

164.   To take a basic shape, and the most efficient shape, out of the possible configurations

would inhibit legitimate competition. "'[G]ranting trade dress protection to an ordinary product

design would create a monopoly in the goods themselves' which would defeat the 'strong federal

policy in favor of vigorously competitive markets.'"  *Keystone*, 394 F. Supp. 2d at (W.D.N.Y.

2005) (quoting *Landscape Forms*, 113 F.3d at 379, 380).

### 5.      Effect of the Design Feature on the Towel's Quality or Cost

The effect of the circular design on the towel's cost or quality is contained in the second

prong of the "traditional rule" (see *TrafFix*, 532 U.S. at 33), but it does little to further the

discussion.  Franek claims that circular towels are in fact more costly to make because they must

be trimmed from square towel stock which creates waste.  Jay Franco provides no evidence to

the contrary.  At the same, time, however, the Court also agrees that the circular shape would not

affect the quality of the towel itself if "quality of towel" is limited to consideration of the fabric

or material making up the towel.   If functionality were limited to this factor, the Court would

deny summary judgment.  The test however is whether the feature is essential to the use or

purpose of the device *or* when it affects the cost or quality of the product.  See *id*. at 32 (citations omitted).

* * * * *

In sum, here, as in many other cases, "[t]he line between nonfunctional and functional is difficult to draw and an obvious source of litigation."  *Kohler*, 12 F.3d at 649 (Cudahy, J., dissenting).  However, in light of the '029 utility patent that claimed and specified a circular beach towel to allow a sunbather to rotate without moving his or her towel, Franek has a heavy burden to come forward with evidence showing a triable issue of fact as to whether his circular towel is non-functional.  He is unable to carry that burden in light of the factors that comprise the functionality inquiry.  See *TrafFix*, 532 U.S. at 29; *Specialized Seating*, 472 F. Supp. 2d at 1011. The record plainly shows that the circular shape of the beach towel contained utilitarian properties.  The record further contains several advertisements that focus on – and, indeed, promote – the functional, utilitarian advantages of the circular design.  To be sure, Franek included in his declaration a statement that "CLM Design adopted the round shape of the beach towel so the round towel's original, distinctive, and peculiar appearance would distinguish it from other beach towels and identify the beach towels as coming from a single source, namely Son International."  But a party's motive in creating the product is not one of the factors courts consider and is certainly insufficient to create a genuine issue of material fact on functionality. Finally, Franek's argument that alternative designs exist also has been rejected because the evidence makes clear that Franek's circular shape was, at a minimum, one of a few superior designs – and in fact was the most efficient design for its purpose.

In the Supreme Court's words,

[t]he functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate

competition by allowing a producer to control a useful product feature. It is the province of patent law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time 35 U.S.C. §§ 154, 173, after which competitors are free to use the innovation. If a product's functional features could be used as trademarks, however, a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever (because trademarks may be renewed in perpetuity).

*Qualitex*, 514 U.S. at 165. Providing a monopoly to the producer of the most efficient design for its purpose would only hinder competition and be inconsistent with the tenets of the Lanham Act. Moreover, it is not required that the design be essential to the functionality – the touchstone is usefulness. See *Eco Manufacturing*, 357 F.3d at 654-655 (rejecting an argument that non-circular thermostat designs were possible and therefore a circular design was not functional). In short, for all of the reason explained above, Franek's trademarked towel is functional and therefore invalid.[14]

---

[14] Although the Court previously denied Franek's motion for leave to file a surreply brief [58], the Court reviewed the motion [51] and response [53] a second time after closer study of the briefing in this matter. While the Court has not hesitated to permit the filing of surreply briefs when a moving party "sandbags" an adversary by raising new arguments in a reply brief, the Court does not believe that Franco engaged in any such conduct in this case. Each brief in the sequence on the motion fairly responded to the arguments in the brief that preceded it. In addition, the Court concludes that both parties had an adequate opportunity to present their arguments – and, in fact, did so in a cogent fashion. Accordingly, the Court has concluded that no additional briefing, including a surreply brief, will be necessary.

**IV.     Conclusion**

For the reasons set forth above, Plaintiffs' motion for partial summary judgment [41] is granted as to Count II of its Complaint for Declaratory Judgment and Other Relief and Franek's U.S. Trademark Registration No. 1,502,261 is invalid as functional.   Plaintiff's motion for summary judgment [41] is also granted as to Counts I through IV of Clemens Franek's Counterclaims against Jay Franco & Sons.

Dated:  March 13, 2009                    _____
                                                          Robert M. Dow, Jr.
                                                          United States District Judge